DEPUTY SHERIFF JOHN VANDERWALKER and HIS WIFE DEPUTY SHERIFF SHERYL VANDERWALKER, BOTH OF WHOM ARE PRESENT IN COURT WITH US TODAY. I don't usually have trouble making myself heard. I apologize for that. We're here today to ask for a jury trial. That's the bottom line on this appeal. This case was dismissed on summary judgment based upon the District Court judges' perceived perception that there was insufficient evidence to support any of our causes of action. I wrote a fairly detailed brief. I'm here this morning to highlight what I feel to be the really critical evidence on our points and respond to whatever questions the Court may have. The parties seem to agree that if the investigation that led to Deputy Sheriff John VanderWalker's termination was predatory and that the outcome was predetermined, there was a violation of procedural due process. There are four issues that I'll highlight today on that particular point. Number one, this was an excessive force complaint. The original complaining witnesses were quickly established to be mendacious in the most important aspects of their claim. These are the women who got sprayed with... Yes. Yes. And I'm going to come back to this, but number one, the complaining witnesses were established to be mendacious. Number two, the accused officer, Deputy VanderWalker, gave a statement early on that totally explained his actions in the context of the rules of engagement as he was given them and as he was ordered to enforce them. Number three, following Deputy VanderWalker's original statement, the confidentiality of the investigation was completely breached and they literally went out looking for any additional evidence from his fellow officers who had been on the scene that evening. And number four, exonerating evidence from his commander that evening, on the evening in question, on the scene, was apparently suppressed and not included as part of the record. Qualifiers always worry me. Apparently suppressed? Okay. If I were arguing... Apparently suppressed. Apparently in the sense that there's no other apparent explanation for it. And what I mean by that is this. Here's what we do know. Can you backtrack for me a minute first? Sure. What are these four factors supposed to be showing us? They're added together in the context of the investigation. They show that this, the outcome of this investigation was predetermined from the get-go. In other words, that Reichert went through the three-and-a-half-hour hearing but never intended any other result. He never intended any. I think from the moment those women, what I think this adds up to is the proposition that from the moment those women went on hard copy, had their snippet of videotape and their mendacious story of the circumstances of that encounter, this was handled not as a personnel complaint but as a matter of public relations, and that the officer responsible for that was going to be found and terminated. And to that extent, I do believe the evidence added up as, in a way, most favorable to the nonmoving party adds up to a predatory, predetermined outcome. Was Reichert involved at all in the investigation? Well, yes and no. He was. He didn't direct the investigation. No, he didn't direct the investigation. But one critical fact. Was he apprised of the ongoing nature of the investigation throughout the investigation? There's circumstantial evidence that he was, and there's direct evidence on one really critical point, and that is this. Point three, when they went out to look for additional evidence, in violation of the manual governing the procedures for personnel complaints, all the officers that were on the scene in Deputy VanderWalker's squad that evening were told, Deputy VanderWalker is the target of this investigation relating to the pepper spray. You give us a statement as to anything you saw him do that evening. All right. Now, that is a violation of the personnel complaint manual. It's a violation of procedure, and the union officer, the president of the Police Officers Guild, did call, and this is in the record, call Sheriff Reichert to complain about that specifically because he was outraged by it. So, and yet the investigation continued. How is it a violation, and what should have been done? Well, it is a violation because the manual commands that investigations are kept strictly confidential in the sense that the potential witnesses are not necessarily supposed to know who the potential accused is unless it's absolutely necessary. What were you supposed to say? You send out a memo saying, did anybody see these women get pepper spray? You don't have to – he didn't have to be identified. There was absolutely – Wasn't there also some evidence in the record, though, that several officers came in and said, in general, VanderWalker was out of control that night? Several other officers said that? I mean, were you spoken to about that? There were. There were other incidents that were generated as a result of this casting this wide net. I thought that there was evidence, and I can't tell you exactly who said it, but that not because of this casting of the wide net, but that some officers went to their supervisory officers and said VanderWalker is out of control and that he was spoken to on the evening of the first day or on the morning of the second day to tell them that and tell them to cool it. There is evidence in the record to that effect, and – Therefore, looking more generally for what it was that he did might have been justified. Well, I think that that's a question of fact. I mean, the – Why is it a question of fact? Is there any contrary effect? Because you were – again, according to the procedures, there are specific procedures for the investigation of complaints against police officers, personnel complaints, and they are supposed to relate all the investigation, all the interviewing, all the evidence generated is supposed to be pointing only to the specific act that is complained of. You're not arguing that that's a due process violation. You're arguing simply that the fact that they violated their own procedures is some evidence of an initial bias. That is absolutely right, and I think that may be one point that I failed to make clear below. Who made the decision to terminate VanderWalker? According to the record, the final decision was Sheriff Rikerts. Before the little pre-termination hearing? Well, that's – there was a memo circulated about three weeks before the so-called Loudermill. We're going to make a decision. We're going to – this officer should be fired. Yep. The investigating officer, Mr. McSwain, made the recommendation that the charges be sustained, and then it went – there was a memo that went up the chain of command recommending termination. Three weeks before the Loudermill hearing, Rikert initialed that memorandum, and then the Loudermill occurred, and then John was terminated the same day. Well, say that again? I mean, that's the way the system works. True. I mean, I didn't necessarily – I mean, it's a sham that he initialed it. No, I don't think that there is any one piece of evidence in the entire case that is conclusive on the issue of whether this was a sham proceeding. However, a piece of evidence is that there was a memo circulating – circulated recommending VanderWalker's termination that was signed by the final decision-maker three weeks before the Loudermill hearing. Is there anybody else that could have ultimately approved his termination? At the Loudermill hearing? No. Somebody in the chain of command had to have the authority to say, this is it. He's fired, and we have to go through the Loudermill hearing and all the other steps. Well, that's not a question that I necessarily explored in discovery, but I assume that – I have always assumed that – The sheriff is ultimately responsible for all the officers, correct? He's the final authority. That's right. He was the final authority, and his testimony was that he made the final decision to terminate VanderWalker. Now, under Loudermill, you're not – are you entitled to an unbiased decision-maker at that early stage in the whole proceeding? You're not necessarily entitled to an unbiased decision-maker, and the rule there is clear. However, there is a fine line between being unbiased and having set in your mind what you're going to do. He clearly is entitled to have a meaningful opportunity to explain himself before he's terminated. And the fact that he gets a – So he asked, do you think that that hearing that took place before the sheriff, do you think it was not a meaningful proceeding? I think a reasonable finder of fact could determine that that was not a meaningful hearing.  Why? Because it was in front of Sheriff Reichert, or is it for some other reason? Because from the beginning, because of all the things that went on before that. I'm talking about the hearing. Let's talk about the hearing for a moment. What took place at the hearing that leads you to say that it was not a meaningful hearing? Well, the only – well, there was no transcript of the hearing, so we don't know exactly what took place. Did he have assistance? Was anybody there representing him?  Union. He was there. Yeah. He was there. And there is evidence from the Union Guild President that they were given short shrift. That's right. So they were cut short. Yes. So that – I cut lawyers short 10 times a day. So does every judge in the world. That's true. And I sometimes get the feeling that the outcome of my argument is predetermined, Your Honor. Not that I mean that here. No, I didn't mean that. Was he cut short on a meaningful area of presentation or something that he wanted to do? Well, the testimony in the record was that he did not seem interested in hearing their explanations. That's the testimony in the record. And he didn't? I'm sorry? That he did not appear interested in hearing the explanation and that he cut their explanations short. But he did sit there for three and a half hours. Yes, he did. And was there any – did anybody chronicle what it is that Eggert says we tried to do and couldn't do? We were prevented from presenting this, this, this, that? Or does he say just it was cut short? He says it was cut short. There was no – Does that mean it was cut off before we had an opportunity to put our – make our case? Well, I mean, certainly that is a reasonable interpretation of that piece of evidence. Another reasonable interpretation of that evidence we submit, combined with the other evidence in the case, would be that this was the culmination of something that had already been determined, that it was going to happen. So, I mean, I – It's not like the case where the mayor said, you know, we're going to fire this guy, and I'll go through the – Well, he was charged – well, I mean, I think he could. I think he's very close to that in many important respects. I'm looking at your list of four factors. And the first two don't particularly impress me. So let's go to the second two, the confidentiality being breached and the exonerating evidence of press. What do you mean by the last, first of all? Captain Ted Stensland. I'm sorry? John VanderWalker's captain on the evening in question was a fellow named Ted Stensland who viewed this videotape of the so-called pepper spray incident. And he testified at deposition that you cannot tell from that pepper spray incident that there was any kind of excessive force because you need to know what the circumstances were behind that use of force. He was never shown Deputy VanderWalker's statement in which Deputy VanderWalker said the exact reason I used that force was my perceived belief that these people weren't leaving, that they constituted a danger to themselves and to other officers. This was an area where there was a report of potential sniper fire. And he was afraid for the safety of his office or fellow officers who were trapped in the headlights of this vehicle. So there – Exonerating evidence that was suppressed. Suppressed by whom? Stensland saying – Ted Stensland saying you can't tell from this videotape that anything was done wrong. That was in deposition later on, right? That's because they suppressed it. They never asked him about the tape in the investigation. The investigation log – They didn't suppress anything because it didn't happen yet. No. No, no, no. He viewed the tape. There is a statement from Stensland. I'm sorry I didn't make that clear. He gave a statement at the time. He was called in at the time as part of the investigation. He was shown the tape. He said at the time, I don't know whether anything was done wrong here or not. And that was not placed in the record of the investigation. He was not asked about that on the tape-recorded statement that he was given. He was never shown the statement of Deputy VanderWalker that might have led him to say, well, this is a perfectly plausible explanation for what happened. And that's why I say the evidence was – exonerating evidence was suppressed because you could read this record 10,000 times and you would never see any indication that his commanding officer felt this videotape that was supposedly so horrible doesn't show excessive force in and of itself. You need to know the circumstances. And that's the whole thing. Nobody would agree with that. Nobody would think that you'd have to know what these people were doing here. And they investigated all that. Why were they there and what were their circumstances? And the fact that they were apparently in some private parking lot. And obviously, that had to have been assessed as part of the discussion, part of the determination. That goes to the first point I made. The very first thing they established about those women is that they were lying. If all it is, is they're up on – Talking about what? About getting sprayed? Nope. About him reaching in and grabbing? I mean, what the women originally said on hard copy in this tabloid show was, we were taping the demonstrations, a police officer approaches – And they established that. I mean, they came to the conclusion that that hadn't happened. But he still sprayed them and they concluded it was excessive. And he reached in the window and grabbed her collar and uttered the now famous obscenity, tape this blank. Without those kind of juices, he reached in and grabbed my collar and he uttered this epithet. That's just a couple of kids up on Broadway who wouldn't leave until they got squirted with pepper spray, just like a lot of other people. The very first thing the investigating officer established, and you can look at the tape and see it, is that he did not reach through the window of that car. He couldn't possibly have done so. The window only came down about this far. But you're making an assumption which that he was fired on the basis that he did those things, as opposed to the fact that he simply sprayed them, pulled on the window and sprayed them. Well, he couldn't possibly have been. It would make no sense to terminate him because he sprayed somebody, simply because he sprayed someone through the window, because there are all kinds of explanations for why he would do that. But the arbitrator ended up believing that he used excessive force. Well, it does not remove the claim that he was terminated in violation. It doesn't – it certainly doesn't affect the procedural due process claim, because this Court has held that a person who is denied. But it certainly weakens the strength of your – if you're relying on what is essentially circumstantial evidence of a preconceived determination. The fact that a independent person came to believe, not that it justified the termination, but that it was excessive, certainly undermines the notion that this was something that one could only believe if you were – if it was a public relations problem. Yeah. The arbitrator said he used excessive force. But part of the responsibility for that lies with the employer who failed to, you know, do what the arbitrator said. But the arbitrator even concluded this was excessive force. And he also concluded that the pepper spray incident was not excessive force. So this is – again, it just goes back to how a jury, I believe, would perceive the sum and substance of this evidence. Okay. So if an arbitrator determines that rather than having been terminated, he should have had two weeks off. I think that's what the – Ten days, I think. Yeah. Ten work days. All right. Or excessive force. I understand that. But the question is whether he should have been – the question of our case is whether he received fair procedural due process leading to the original termination. But it is true that you're – what you're asking to go to the jury on, it's a set of circumstantial evidence from which you think that they could surmise that this was a preconceived end in which no matter what happened at the lateral hearing, Reichert was going to conclude. That's exactly what – that's exactly right. And therefore, it is some – why isn't it some measure of whether any jury would believe that, that – what happened down the line? Because Reichert didn't give him two weeks off. Reichert fired him. And Reichert also acknowledged at his deposition – excuse me, at the arbitration testimony that the combined acts of pepper spraying and kicking don't add up to termination. And yet he was terminated for those acts. Where is this deposition testimony you're talking about? At the arbitration – at the underlying arbitration at which the arbitrator ordered that Vander Walker be reinstated. Sheriff Reichert admitted under oath that the combined force used between the pepper spraying and kicking incident don't add up to termination. He tried to justify the termination based upon perceived dishonesty stemming from the fact that in the course of – He ran into him rather than kicked him? He said he didn't remember it. He said he didn't – it would have been the easiest thing in the world. I mean, to picture this incident, again, this particular person has never come forward, never been identified, never made a claim. But we do know that she was actively participating in the riot to the extent that she was a, quote, aid worker. She was bringing aid to the very people who were throwing rocks and bottles and golf balls and garbage at Sheriff Reichert's own people. She said that. She was bringing aid to the people who weren't. Well, that's what she said. And that's what the investigation demonstrated. They traced her to a local anarchist society. But in any event, she was not authorized to be on the street. She was in dark clothing. She was wearing a gas mask. She had her back turned to Deputy Reichert as he approached her. She was leaning over a box of some sort. And we don't know to this day what was in that box. And certainly, Detective VanderWalker didn't know at the time. So it would have been very easy to come up with a version of events that would have justified any action he took. All he said is, I don't remember doing it. He didn't remember. He also said definitively, I didn't kick anybody. He says – well, I mean, he said it's not in my nature to kick anybody. That's right. I didn't kick anybody. Okay. Well, if he doesn't remember doing it, then he feels strongly that that's not the sort of thing he would ordinarily do. And, of course, ordinarily, he's not working 18-hour shifts under riot conditions three straight days. Then I think he probably is going to say, I don't kick people and deny doing something like that. Well, then the question is, could somebody reasonably believe – first of all, this whole hearing was, in the essence, a probable cause hearing, right? The bladderable hearing was essentially a probable cause hearing. I've never heard it phrased exactly that, but okay, yes. Because there was going to be an ultimate hearing, and there was an ultimate hearing. Well, there was – that's not necessarily for certain. I mean, there are deputy sheriffs and other public personnel who are terminated following louder mills that don't choose to grieve the termination. Well, they don't choose to, but if he wants one, there's another one. Right. It's available. But the law is also clear that a tainted pre-termination proceeding cannot be remedied or made good just because there is a post-termination remedy. Right. What I'm trying to characterize is what is a louder mill hearing. It's not a final decision. It's in the nature of a reasonable cause to fire somebody. Yeah. It's the employee's last chance to explain to somebody who's willing to listen to him or her the circumstances of the situation. My question is, what was Reichert supposed to be deciding? Was he deciding that this is my final decision? Well, I guess it was his final decision. It was his final decision. It wasn't the final decision. He was deciding whether John Vander Waal was going to come to work Monday or not. I mean, that – without trying to be flip, that was the last final hearing. And he was supposed to be determining whether the combination of these alleged events generated enough or was sufficient to merit termination. Thank you, counsel. Thank you. We'll go from King County. Good morning. May it please the Court and counsel, my name is Regina Cahan from the Prosecuting Attorney's Office. We're here today. They raised three issues, essentially, procedural and substantive due process, defamation, and double damages. With respect to procedural and substantive due process, I think it's clear that Vander Walker got his full panoply of rights. There obviously is property interest in one's job. Well, the issue that was being discussed is really the important issue here, or the possibly valuable one, i.e., was the procedural – was the lateral hearing a sham, essentially? I mean, was there any chance that he could have prevailed at it, or was it predetermined? I don't think there's any evidence that it was predetermined. The sheriff himself testified that he didn't make any decision until after the laudamill. The laudamill lasted three and a half hours, which is unusual. The sheriff testified that's a very long laudamill. They looked at all the videotapes together. They questioned – they had long colloquy regarding the videotapes and the – Vander Walker's intentions when he was – So take a hypothetical. Suppose there was evidence, however, that before he walked in there, he said to his underlings, well, I'm just going in here to hear what he has to say because I have to, but I'm telling you no matter what he says, he's terminated. Then that's sham, and that's exactly what's in Wagner v. City of Memphis, which is the case that you referred to with the mayor. That's not at all what happened here, though. There's absolutely no evidence of that. And his argument is there's circumstantial evidence from which a jury could conclude that there was. So that seems to me to be the interesting question. In other words, we don't have the smoking gun. Is there some way without the smoking gun that a reasonable jury could conclude that, in fact, that was what was in Ryker's mind even though he never said it or he said it and it didn't come out one way or the other? Well, I don't think so, and I think Judge Lasnik hit it on the line when he found that there's insufficient evidence to show that. There's no evidence to show that. Sheriff Ryker is the ultimate decision maker. He was not the one who was involved in the investigation. Detective McSwain is involved. So some of the inadequacies that they point to in the investigation have nothing to do with Sheriff Ryker's decision making. Things about it going up the chain, that's a recommendation. That's how it gets to Sheriff Ryker. But he, and he's testified he's a very independent decision maker and things often have been recommended for termination and then he doesn't terminate. So then there's testimony to that in the record. So there, and he said he had not made up his mind. This was a difficult decision for him. This is a long-term employee under a difficult situation, and he acknowledged that. So there is no evidence in the record that this was any sort of sham similar to Wagner. He had, Wagner Walker was represented by, you know, Steve Eggert, a very experienced guild representative. They took three and a half hours. They reviewed all the statements. They looked at all the videotapes. And Sheriff Ryker testified that he had not made up his mind until after the hearing.  There's also, in terms of the property interest, all of the Laudermill rights have been followed here, which is the notice of the charges against him, an explanation of employer's evidence, and the opposite. Sotomayor, was there somebody at the Laudermill hearing representing the sheriff or assisting the sheriff? No. The sheriff is there. Also, I believe the investigator, John McSwain, is there as more of an observer in what happens. Generally, I believe both McSwain and the sheriff testified to this in the arbitration. They have, they let the employee speak, and that's usually through the Eggert here and the union rep. And sometimes they'll go out and they'll have some conversation between themselves, like the sheriff might ask the investigators some follow-up questions. Then he'll bring the employees back in and ask them more questions. And that's the kind of thing that happened here. Here, it's clear that there was notice with respect to the pepper spray incident. There was the IIU completed the notification form on 12-2099, December 20, 1999. With regard to the fact that the original charge charged Vandewalker with these – with regard to the two girls, with making the statement that everyone seems to think we could have been hurt, and also with reaching into the car when the videotape shows otherwise, at the time of the firing, were those two facts still in the allegations or not? Those two facts are not part of the reason for the sheriff's records firing. It's acknowledged in the investigation that the girls, you know, not just they didn't have the cleanest hands, but weren't the most credible. But the sheriff's position was that there were other available means of telling the girls to get out of the area besides pepper spraying them the minute the car went down two inches. And that's what was found to be unjustified and excessive force. All right. So he wasn't fired on the basis of those two statements? Absolutely not. Or incidents having happened. Right. He was fired because he used excessive – and there were sustained findings, and I appreciate the arbitrator, you know, had a difference of opinion. But the sheriff's opinion and the IIU investigator was there were sustained findings for unjustified and excessive force for the pepper spray. There was sustained findings for unjustified and excessive force for the kick of a woman kneeling down completely unprovoked. And there was a sustained finding for dishonesty with respect to the kick incident, which within the investigation, John VanderWalker continually said that he never kicked anyone, and McSwain had a videotape of him kicking someone. So they found that he was being dishonest. With respect to notice in that, so you had notice on 12-2099. He also, Mr. VanderWalker, acknowledged that notice during his IIU investigation on 12-22. He had notice of the kick on March 1st. He acknowledged that notice on March 15th. And then he had notice of the dishonesty allegations on March 21st, 2000, and his laudermill was not until April 14th. So he had notice for three weeks. They received the entire investigation, they being the guild and the videotapes, opportunity to see the videotapes, and there was no question or ever raised that they had an explanation of all the employer's evidence. And then they had this opportunity to respond for three and a half hours during the laudermill. So it's clear that the procedural due process rights have been met. Substantive due process, to establish a substantive due process claim, Mr. VanderWalker must show that the government actions shocked the conscience, Nunez v. City of L.A., or that the action was irrational or arbitrary, Kellick v. Director. There is no evidence here that this decision by Sheriff Reichert shocked the conscience or was irrational. Next, with respect to defamation, the claim requires a statement was false, the statement was not privileged, false, and false statement is approximate cause of damage, and that would be under Corbellia Mark. Here they basically rely on the press release when Sheriff Reichert fired John VanderWalker, and although there may have been some inaccuracies, first of all, I don't know if there's any false statements, what the court found was there may have been, for example, they alleged that why didn't they say he was fired for dishonesty, where they did say in the press release that he was fired for two excessive force incidents, and then later in the last paragraph he talks about integrity, so it's a little less direct. The Sheriff Reichert testified that, frankly, they did that on purpose, because integrity is very important to the sheriff's office. This doesn't hurt VanderWalker. If anything, it helps VanderWalker. So the sting that they talk about in defamation cases certainly, you know, isn't there. There is no evidence of falsity, no genuine issues of facts raised for falsity in the press release. Even assuming it was there, the sting, as I discussed, wasn't there. The court also doesn't address privilege. However, it seems clear that under corporeal that the sheriff's statements would be privileged and that the plaintiff or the appellant would have to show malice, and they certainly didn't do that here as well. False light is the same. First of all, there wasn't false claims shown, and they can't show it was reckless. VanderWalker didn't sufficiently cite what facts he was even using to support this claim. In district court, he raised the information from his personnel file that was also published in a PERC decision, and the court found that, you know, you can't raise claims that are unpublished to have a false light. And then the videos themselves, obviously, they are accurate. First of all, they're not false. The sheriff didn't distribute them. The media did, or the girls. So it's not the sheriff's actions. And then the press release wasn't false in the first place. Back pay issue. Keeton County delayed in paying the back pay award while lawfully seeking review of the arbitrator's decision, and this was pursuant to a good-faith bona fide dispute. They argued that there should be double damages. The exception to that is a bona fide dispute. Here under shilling, it's similar to shilling versus radio. To be a bona fide dispute, there must be a fairly debatable dispute over whether all or a portion of the wages must be paid. Here we had two reasons. First of all, there was a bona fide dispute over whether the arbitrator's decision or award was arbitrary and capricious, and we had the legal right to apply for an application, constitutional writ of certiorari, and we did that.  Even after we appealed and the writ was denied on October 19th, 2001, on November 13th, within the 30-day period that we had to appeal, we notified the guild and said, we're not going to appeal here, we'll tender an amount of $67,361. And the guild rejected that and said, oh, we want more money. So there was, and within a couple months there was negotiations and it was settled, but there was clearly a bona fide dispute with respect to the amount. And because of those two reasons, double damages should not be awarded. Judge Lasnik was correct in all of his findings, and I ask that this Court affirm. If there's no other questions, thank you. Thank you, counsel. The VAC pay issue, I didn't get the opportunity to address that originally, so I'll take one minute to address that if I may. I didn't get the opportunity to address it. This is a rebuttal. Okay. Well, then, in a rebuttal to what you said about the VAC pay issue, he was reinstated by the arbitrator who told the county to put him back to work and give him VAC pay in May. They put him back to work in a patrol car. Among the most dangerous occupations there is, within a couple weeks, they didn't even tender one penny of VAC pay for six months. That's why, because they brought a written court and they gave it a shot, and then when they lost their pay? Right. And if somebody gets a judgment against me in superior court, I have the legal right to appeal it. But if I don't post a bond, I'm going to lose my property because the mere fact that I exercise my legal right to appeal doesn't generate a change in the status quo. And from the moment that the arbitrator ---- This particular State statute apparently has an exception for a good-faith dispute. It doesn't say that they don't have to ---- there is no case anywhere, or certainly no language in the statute that says you don't have to comply with an arbitrator's award while you seek certiorari. You don't have to pay wages when there's a good-faith dispute, no? Okay. So but the good ---- there is no dispute. There's never been a dispute that there was an arbitrator's award that said put him back to work and pay him his VAC pay. There's no dispute that they put him back to work. They put him back to work in a patrol car. So how can they say that we'll comply with part of this award that suits us because we need people out there, but not comply with the part that doesn't suit us because we don't want to pay them the money yet? And so ---- Presumably, they thought the money was going to be ---- they were going to pay it sooner or later if they had to pay it, but they didn't want to run it further back. Well, that's what people say. That's why they don't ---- that's why the statute exists. Let me go back and summarize really where we started. Summarize for me again briefly the evidence that you think shows that this was a sham ladder-melt hearing. From the beginning, first place it was started, not as a result of any complaint or interview with the so-called victims, but as a response to their appearance on a TV show and making allegations, the first thing they established was that these women had no credibility. They were not telling the truth. Because you look at the videotape and you see that he didn't reach through the window. You talk to the people who were up there at the ---- The first piece of evidence is that it came from no complaint but from a TV show. Yes. Second piece of evidence is that ---- That tends to show it was a sham. It does not conclusively establish that it's a sham. I wouldn't suggest that. It shows the background. Next is that one of the first things they established is that these women were not telling the truth about the allegations that take this away from just being some kids up at the scene who got pepper sprayed and makes it some kind of vicious assault by the police officer. Why would they continue an investigation when they know ---- I got an answer for you, but go on. All right. Then once the officer gives a credible explanation for what happened, they violate their own procedures and search for additional evidence in violation of their own manual. Now, that's not even a matter of construing the evidence in the light most favorable to us. That happened. That's undisputed. They did that. They sent out ---- I got you. So next one. His captain, the person on the scene, comes in, looks at the video and says, well, you know, it's not in the record. It was apparently excluded. That's not in the record. That's right. Next. Next. The investigating officers report final reports as I recommend these charges be sustained based on the girl's statements to the media. They had never still given a statement to the police by the time the charges were sustained. So he recommends sustained findings of excessive force based on statements to the media that he knows are substantially false. It's the first thing he established. But in the end, isn't the problem with all of this? How is it connected to Reichert? Reichert is in charge of the investigation. Or excuse me. He's the person who had the hearing, and it was only a sham if he was behind all the rest of it. That's right. He's not the mayor saying we're going to fire him, now let's have the hearing. And there's direct evidence that he was told by the guild president of this violation of the confidentiality of the investigation and took no action. He was told that the union guild president, Steve Edgar, called him up and said, you're circulating requests for damning evidence. That's in violation of the procedures. Thank you, counsel. The case just argued is order submitted, and we'll be back tomorrow at 9 o'clock. All rise. This clerk for this session stands adjourned. Thank you.
judges: Trott, Paez, Berzon